however, we examine the resolution of the directors, we find in the preamble a declaration that the alleged deficiency of assets reported by the superintendent of banks is absolutely false, and a further declaration by the directors that they know the company to be absolutely solvent, and that its assets are absolutely equal to, and in excess of, its liabilities. It thus appears from the statement of the directors themselves that the condition did not exist which was necessary to make the consent of the shareholders effective. The shareholders were willing that the value of their holdings should be scaled down if there actually was a deficiency, but it is absurd to suppose that they intended to empower the directors to scale them down unless the directors believed that such a deficiency existed. The directors of a corporation cannot charge a sum against its stock, as representing a loss, when they in the same breath deny that there has been any loss whatever. No authority to do this can be found in the defendant's articles of association, or in any judicial decision. The loss under consideration in the case of People v. Bankers' Loan & Investment Co., 13 Misc. Rep. 221, 34 N. Y. Supp. 235, was undisputed. Under the conditions which existed, the defendant corporation was not aided by the attempt of the directors to scale down the value of the shares. When we consider the practice of the defendant corporation in regard to the payment of withdrawal certificates, involving a liability of $95,141.31, the apparent wastefulness of the agency contract, and the other indications of mismanagement disclosed by the bank examiner's report, I am compelled to conclude, contrary to my first impression, that the receivership which has been ordered is probably conducive to the best interests of all the subscribers who have invested their money in this enterprise.

For these reasons, I think we should affirm the order appealed from.

Order affirmed, with $10 costs and disbursements. All concur.

PIERSON v. NEW YORK, N. H. & H. R. CO.

(Supreme Court, Appellate Division, Second Department. July 17, 1900.)

1. RAILROADS—SUITABLE ENGINE—NEGLIGENCE OF ENGINEER—QUESTION FOR JURY.

The air brakes of decedent's engine were supplied with steam from the locomotive boiler, and it required 110 pounds to operate both. After a short run, the steam became too low to operate the brakes because of a leak in the steam pipe, and decedent telegraphed for a relief engine to meet him at N. Seventeen miles from N. the steam had risen to 150 pounds, and the air brakes were all right. One-half mile from N. they refused to work, whereby decedent's engine collided with the relief engine, standing 250 feet beyond N. *Held*, that a motion to dismiss the complaint was properly refused, since the question of whether decedent was negligent in continuing the use of the engine was for the jury.

2. SAME—INSPECTION—NEGLIGENCE.

Where decedent was killed by failure of air brakes to work, because of a leak in a steam pipe in the smoke box, and the engine had not been inspected for several days prior to the accident, a verdict that defendant was guilty of negligence was justified.

**8. SAME—INJURY—PROXIMATE CAUSE.**
> Where decedent was killed by failure of air brakes to work, because of a leak in a steam pipe in the smoke box, and the engine had not been inspected for several days prior to the accident, the failure to furnish a suitable engine was the proximate cause of the injury.

**4. SAME—HIDDEN DEFECT—ASSUMPTION OF RISK.**
> Where decedent, after discovering the air brakes on his engine refused to work, because of a leak in a steam pipe, telegraphed for a relief engine to meet him at N., and the air brakes worked 17 miles from N., but refused to work ½ mile from there, whereby his engine collided with the relief engine, the decedent did not assume the risk, since the defect was not one of which he was chargeable with knowledge, and he had a right to rely on defendant's furnishing him with a suitable engine.

**5. SAME—CUSTOM—EFFECT.**
> Where decedent discovered that the air brakes on his engine did not work, because of a leak in a steam pipe, and telegraphed for a relief engine to meet him at N., and the brakes worked 17 miles from N., but refused to work ½ mile from there, whereby his engine collided with the relief engine, standing 250 feet beyond N., the fact that it was the custom of the road in such a case to station the relief engine about that distance from the depot was not sufficient to charge decedent with negligence, since he had a right to rely on defendant's furnishing him with an engine that could be stopped within a reasonable distance.

Appeal from trial term, Westchester county.

Action by Annie L. Pierson, as executrix, against the New York, New Haven & Hartford Railroad Company. From a judgment in favor of plaintiff, and an order denying a new trial, defendant appeals. Affirmed.

Argued before GOODRICH, P. J., and BARTLETT, WOODWARD, HIRSCHBERG, and JENKS, JJ.

Henry W. Taft, for appellant.
Isaac N. Mills, for respondent.

GOODRICH, P. J. The action was brought to recover damages received from the death of the plaintiff's decedent, through the alleged negligence of the defendant, at New Haven, Conn., in September, 1897. The Connecticut statute bearing upon such cases is similar to the one in New York, except that the maximum limit of recovery is $5,000. The plaintiff recovered a verdict of $4,000, and the defendant appeals from the judgment entered upon the verdict, and from the order denying the defendant's motion for a new trial.

Certain facts are established by the evidence. The decedent had been a locomotive engineer in the employ of the defendant for 20 years, having been employed on other roads in the same capacity for 15 years previously. For the 10 years before his death he had run an express train between New York City and Springfield every other day. On the day of the accident his train started from New York City at 9 o'clock in the morning, having the full pressure of 180 pounds of steam. It was equipped with the Westinghouse automatic air-brake system, under the management of the engineer. The steam pressure for these brakes was supplied from the locomotive boiler. Each car of the train had a conductor's valve connected with the air brakes, and also hand brakes on the platforms for use in cases of emergency. These were put in operation on signal from the engineer. The schedule stops were Stamford, South Norwalk, Bridge-

port, and New Haven; the distance from New York to New Haven being 74 miles. On the morning of the accident some difficulty was observed by the engineer and fireman in making steam just after leaving New York, and while in the Fourth avenue tunnel; it appearing that sufficient steam was not generated to run the train on schedule time. At Woodlawn, 13 miles out of New York, they searched for the cause, and found that there was "a blow of the steam pipe in the smoke box." Owing to the lack of steam, the train was 6 minutes late at Stamford, 12 minutes late at South Norwalk, and 10 minutes late at Bridgeport, where the steam pressure was 90 pounds, somewhat higher than at preceding stations. The stop at Bridgeport was longer than usual. The fire was brightened up, and the steam run up to 150 pounds when that city was left. At Bridgeport, however, the engineer had caused a telegram to be sent to New Haven for an engine there to take the place of his, for the purpose of completing the trip to Springfield. The air brakes worked properly when the train left Bridgeport, and there was no occasion to use them again until the train was nearing New Haven. About a half mile from that station the engineer attempted to release the air brakes, but they failed to work. The steam had run down to between 80 and 100 pounds. He gave a whistle signal for hand brakes, which were applied, and the fireman reversed the engine; but the train could not be stopped, and ran into the relief engine which had been stationed 200 or 300 feet beyond the station, where the train ordinarily stopped. The decedent's engine was overturned and he was killed.

· At the close of the plaintiff's evidence, and again at the close of the whole case, the defendant moved to dismiss the complaint, on the grounds—First, that the decedent was not shown to have been free from contributory negligence; second, that the defendant was not guilty of any negligence for the proximate cause of the accident; third, that the decedent assumed any risk which was the proximate cause of the accident. The denial of this motion and the charge raise the main points which have been argued on this appeal.

First, as to the contributory negligence of the deceased, the defendant's counsel contends that the engineer knew that he ought to save steam enough to run the air brakes, that he failed to watch the air gauge continually and thus to notice the reduction in the air pressure, and that he did not apply brakes at intermediate points, by doing which he might have learned that there was failure of power to work the brakes. There was no direct proof of any such failure, and at the utmost it was a question of fact, to be submitted to the jury. There was a rule of the road, known to the engineer, that he must never sacrifice safety for speed. Some expert evidence was offered which might justify the inference that the engineer had shut off the steam from the air brakes for the purpose of using the entire power for running the train, in order to make up lost time, and that he did this to such an extent that the power was reduced below 110 pounds, which was not sufficient to supply both motive power and the air-brake pressure. This, also, was a question of fact for the jury.

65 N.Y.S.—66

We are brought to the questions whether the decedent was bound to act otherwise than he did after the discovery of some leak or other fact which more or less affected the power of the engine to supply sufficient steam both for the motive power and the air brakes, and whether he took the risk of an accident resulting from running the engine in its crippled condition. The plaintiff, from the necessity of the situation, had but one witness, the fireman, to prove the occurrences on the engine during the trip and up to the time of the accident. At the time of the trial this fireman was still in the employ of the defendant, and it was within the province of the jury to decide what amount of credence should be given to his evidence. The testimony furnishes an elaborate description of the Westinghouse automatic air brake, which it is useless to repeat, except to state that 110 pounds of steam power were essential to the proper working of the engine and brakes. On the engine were gauges to indicate the air pressure and also the steam pressure. When the power ran down on the steam gauge to 90 pounds, it did not suffice to run the engine and work the air brakes; but it appeared that before the train left Bridgeport steam was applied to the air brakes, which were found to work and were properly set. These brakes work by release of the steam power, and, being charged, will continue to be ready for use some minutes, although there is always more or less leakage. The jury were justified in finding that the engineer had the right to assume that the brakes would be ready for use at New Haven, after the short run of 17 miles from Bridgeport to that place, during which time the air brakes were not used. It was not until the engineer attempted to set them, $\frac{1}{2}$ mile west of New Haven, that their failure to operate became apparent. There is some evidence that, when he discovered that the brakes were out of order, he stepped back and looked down at the stopcock in the air pipe between the engine and the tender; but there is no evidence as to what its condition was. There is only an inference that it was in order from the fact that he went back to his position and raised his hand to the throttle by which air was admitted to this air-brake pipe. Whether he opened this throttle or not does not appear. The testimony was such as to require the submission to the jury of all questions connected with the continued use of the engine, the running of it at high speed, and the action of the engineer in attempting to release the air brake and in signaling for hand brakes; and this was done by the court.

Second, as to the negligence of the defendant, it was its duty to furnish a safe engine and to see that it was in order, so far as that could be done by fair and periodical inspection. The evidence clearly shows that there was no inspection of the engine for some days before the accident, other than that given to it by each engineer who from time to time was running it. On other roads, as the testimony shows, there is a daily inspection by an official employed for that purpose. The evidence of failure of inspection was such as to justify a verdict that the defendant was negligent in that respect. In Gottlieb v. Railroad Co., 100 N. Y. 462, 3 N. E. 344, the court, referring to the duty of the defendant to furnish safe cars and ma-

chinery to its employés, spoke of the defect causing the accident as an "obvious one, easily discoverable by the most ordinary inspection," and said that it seemed to be the grossest negligence to put such cars into the train. That language seems applicable to the case at bar. There is no doubt that the cause of the reduction of steam pressure was a leak, and that the leak disclosed itself shortly after the train started. It is difficult to believe that careful inspection before the engine was put in use would not have discovered the leak, and it was proved that there was no inspection for some days previously. Ryan, the engineer who ran this engine the day before the accident, testified that he had no difficulty, and that there was no material leak; but this only raised a question for the jury.

Third, as to the decedent's assuming the risk of the defect which was the proximate cause of the collision, there can be no doubt that the proximate cause of the collision was the failure of the engine to supply steam to the air brakes. That was not an act with which the engineer is chargeable, for he had the right to assume that the defendant had discharged its duty in furnishing a suitable engine. It was the failure to furnish such an engine which must be considered the proximate cause of the collision, and the plaintiff did not assume any risk in connection therewith. At any rate, it was a question for the jury.

The court was requested to charge that the deceased assumed the risk of the defect in the engine, and the request was assented to, with the limitation that this was true if the deceased knew of the defect. The verdict establishes the fact that he did not know of any defect in the engine, of such importance that he was bound to know that he ought not to continue to use the engine in the manner and at the speed shown by the evidence. We have examined the other exceptions to the refusals to charge matters in this connection, but they all rest upon the same basis as the one just adverted to, and we find no reversible error to be predicated of them.

The defendant contends that the act of the decedent in telegraphing for a relief engine, coupled with his knowledge of the custom to station such engine in the position occupied by it at the time of the accident, placed upon him any responsibility of any danger resulting from having an engine in that position on the track ahead. There was evidence that it was the custom of other roads to place such relief engines upon a switch, instead of upon the main track; but, whether or not it was negligence to station the relief engine on the track in front of the moving train, the decedent had the right to rely upon the belief that he had been furnished with an engine suitable for his work,—that is, an engine capable of supplying sufficient steam to work the brakes,—in which case there was no probability of running into the relief engine. The question whether the defendant was guilty of negligence, upon all the evidence, was properly submitted to the jury.

We find no reversible error, and the judgment should be affirmed.

Judgment and order affirmed, with costs. All concur.