GEORGE W. WHEELER, Appellee, *vs.* THE CHICAGO AND
    WESTERN INDIANA RAILROAD COMPANY *et al.* Appel-
    lants.

*Opinion filed February 17, 1915—Rehearing denied April 8, 1915.*

1. MASTER AND SERVANT—*when rule as to assumption of risk
by continuing to use defective appliance does not apply.* The rule
as to the assumption of risk by a servant by continuing to use a
defective appliance with knowledge on his part of the defect does
not apply where the servant is not only relying upon the master's
promise to repair but upon his assurance that the repairs have
been made.

2. SAME—*the questions of assumed risk and contributory neg-
ligence are distinct.* The questions of contributory negligence and
assumed risk may both arise under the facts of a case yet they be
separate and distinct, as the question of assumed risk only arises
by virtue of the employment or by continuance in such employ-
ment with knowledge of the defect or danger.

3. SAME—*general rule as to assumption of risk.* A servant is
regarded as voluntarily assuming the risks resulting from the use
of defective machinery if such defects are as well known to him
as to the master, and where the danger from the defects is also
known to him or is so obvious to a person of ordinary intelligence
that the law will charge him with knowledge of the danger.

4. SAME—*what questions may arise where servant continues
to work after learning of extraordinary danger.* Where a servant
continues to work after learning he is exposed to extraordinary
danger arising from a defective condition of some instrumentality
used by his master, there may be presented both the question
whether he has elected to include the additional risk among those
which he is deemed to have accepted by virtue of his contractual
relation, and the question whether, under the circumstances, he has
used prudence in remaining in the position where he must incur
the new hazard.

5. SAME—*question of assumed risk does not arise where ser-
vant does dangerous work in obedience to command.* The ques-
tion of assumed risk does not arise where a servant performs dan-
gerous work in obedience to a command of the master, but the
question in such case is one of contributory negligence, depending
upon whether the danger was so great that a person of ordinary
prudence would not have incurred it.

6. SAME—*when question is one of contributory negligence and
not of assumed risk.* The risk of a defect is not assumed by the

servant where he calls the attention of the master to the defect and receives a promise of repair, as he may then remain in service a reasonable time under such promise; but in such case it is a question for the jury to say what is a reasonable time, and the question, in case of injury, is one of contributory negligence.

7. SAME—*when servant may rely upon assurance that repairs have been made.* Where a reasonable time has elapsed to repair a defect complained of by the servant and he is assured by the master that the repairs have been made, the servant has a right to rely upon such assurance until he discovers that the repairs have not been made:

8. SAME—*when servant is not required to stop work immediately.* Where a locomotive engineer complains of a defect, which the round-house foreman promises to repair when the engine is brought in on Saturday night and which the foreman assures him has been repaired when the engine is taken out on Monday morning, the fact that the engineer, after running the engine a few hours, discovers that it is working much as it did before the alleged repair does not require that he immediately cease working with the engine in order to avoid the imputation of assumed risk or contributory negligence, particularly where the defective part is so located as to require an extended inspection by the engineer to·discover whether the repair had, in fact, been made.

9. PLEADING—*when omission of the word "not" from count of declaration is not fatal.* The omission of the word "not" from an allegation, to the effect that the plaintiff went to work "with said engine [not] knowing that said engine had not been repaired," is not fatal to a recovery, where a reading of the whole count leaves no doubt as to its real meaning, and the record shows that the count was treated by both parties as containing the word "not" until after the jury returned their verdict.

10. SAME—*when parties cannot complain that the facts proven are not within the scope of the pleadings.* Where both parties to a suit submit instructions declaring the rules of law applicable to the facts proven and request the jury to return their verdict in accordance with those rules of law as applied to the facts proven, neither party can be heard to complain that such facts were not within the scope of the allegations of the pleadings under which they were allowed to be proven.

11. SAME—*when one defendant cannot raise question that the plaintiff was not its servant.* Where the two railroad companies sued for personal injury join in a plea of the general issue, which is the only plea filed to a declaration charging that the plaintiff was in the employ of both companies, and the evidence tends to prove such charge, one company cannot, on appeal, raise the ques-

tion that the trial court should have directed a verdict of not guilty as to it because the evidence did not show that the plaintiff was its servant.

12. EVIDENCE—*what is not an improper examination of medical experts.* Where there is no dispute that the plaintiff was injured in the manner claimed, it is not improper to allow plaintiff's counsel to inquire of medical experts whether or not they saw any connection between the injury, the condition that followed and the present condition of the plaintiff, and to permit the answers that in their opinion the violence of the alleged accident resulted in the present condition.

13. SAME—*when a refusal to allow defendant's physicians to make examination of injury in presence of jury is not error.* The fact that the plaintiff is allowed to exhibit his injured leg to the jury does not require the court to permit the defendant's physicians to make an examination of the plaintiff's leg in the presence of the jury, and a refusal to grant such permission is not error, particularly where the plaintiff offered to submit to an examination by the physician of the defendant who had previously examined him and treated him for the injury.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. HOMER ABBOTT, Judge, presiding.

C. G. AUSTIN, (WILLIAM S. KIES, and CHAS. LEROY BROWN, of counsel,) for appellants.

CLARENCE S. DARROW, (EDGAR L. MASTERS, of counsel,) for appellee.

Mr. JUSTICE CRAIG delivered the opinion of the court:

This was an action on the case in the superior court of Cook county by appellee, George W. Wheeler, plaintiff in the court below, against the Chicago and Western Indiana Railroad Company and the Belt Railway Company of Chicago, defendants in the court below, appellants here, to recover damages for injuries sustained on August 12, 1907, while employed as a locomotive engineer operating an en-

gine in and about certain construction work for the Belt Railway Company in the city of Chicago. The declaration contained four counts. In the first two counts it was charged that defendants violated their duty in failing to furnish plaintiff with safe and suitable appliances with which to do his work as a locomotive engineer. The third count charged that the plaintiff notified the defendants of the defective, unsafe and unsuitable condition of certain parts of the engine and they promised to repair the same, and relying upon such promise plaintiff continued in their employ and was injured. This count will be fully considered later. The fourth count charged that defendants furnished plaintiff with an unsafe and unsuitable engine; that defendants had notice of its defective and unsafe condition and promised to repair the same but neglected so to do, although they thereafter, through their proper officers and agents, assured plaintiff that the same had been repaired and placed in a proper and suitable condition for use; that acting upon such assurances plaintiff undertook to operate the engine and was injured. The defendants filed a joint plea of the general issue to the declaration. The cause was tried before a jury and resulted in a verdict in favor of the plaintiff for $20,000. A *remittitur* of $5000 from the verdict was agreed to by plaintiff in the trial court and judgment entered for $15,000. On appeal to the Appellate Court for the First District the judgment of the lower court was affirmed, and the case is brought to this court by appeal, a certificate of importance having been granted by the Appellate Court.

At the close of the plaintiff's case, and again at the conclusion of the trial, each defendant made a separate motion for a peremptory instruction to the jury to find each defendant not guilty on each separate count of the declaration, and also made various motions to exclude part of the evidence of certain witnesses, all of which motions were overruled. The defendants also asked the court to submit

to the jury certain interrogatories or special findings. Two interrogatories were submitted to the jury, both of which were answered in the affirmative. In the first instruction given at the instance of both the defendants the court instructed the jury there could be no recovery under the first and second counts of the declaration, and as plaintiff has assigned no cross-errors on the giving of this instruction it is unnecessary to consider the sufficiency of these counts to sustain the verdict and judgment, or the ruling of the court in denying the motion made to exclude the evidence and give the peremptory instruction as to each of these counts, made at the close of the trial. After the motion for a new trial was overruled defendants made their motion in arrest of judgment, which, in turn, was overruled and judgment entered on the verdict. An appeal was then allowed and perfected to the Appellate Court by defendants, as above stated.

Appellants urge the following reasons as grounds for reversal, viz.: (1) That the court erred in refusing to direct a verdict for the defendants; (2) that the special findings of the jury are inconsistent with their general verdict, and therefore a new trial should have been granted; (3) that the declaration was insufficient to sustain the verdict and judgment, and that the court therefore erred in overruling the motion in arrest of judgment; (4) that the court erred in giving certain instructions; (5) that the court erred in its rulings upon the evidence; and (6) that the court erred in denying the motion of the Belt Railway Company for a directed verdict.

The contention is made that neither the third nor fourth count of the declaration is sufficient to sustain the verdict and judgment. The charge in the third count is that there was a defective and unsafe condition in the counter-balance spring on the locomotive engine on which plaintiff was required to work; that he notified defendants' officers and agents of such defective condition, and thereupon defend-

ants, through their proper officers and agents, promised to repair said counter-balance spring and place the same, and the engine upon which plaintiff was required to work, in a reasonably safe and proper condition of repair for plaintiff's use; that defendants disregarded their duty to make the necessary repairs in that behalf, and by reason thereof, while working in and about said engine, in the exercise of all due care and caution for his own safety, plaintiff was caught and struck by a certain lever or handle of a piece of machinery then and there being a part of said engine and used in connection with said counter-balance spring, which, because of such defective and unsafe condition of the said counter-balance spring, was caused to, and did, jerk forward and backward, striking plaintiff, by reason whereof he suffered divers and severe injuries. The fourth count is similar to the third, with the further allegation that plaintiff, after notifying defendants, through their proper officers and agents, of the defective and unsafe condition of said locomotive engine and said counter-balance spring, and before again attempting to use the same, inquired of defendants' agents, before taking the engine in question out for use, whether or not said engine had been repaired, and that defendants' agents then and there assured plaintiff that the same had been properly repaired and placed in a safe, suitable and proper condition of repair for use and was all right, and that, relying upon said assurance, plaintiff went to work with said engine (not) knowing that said engine had not been repaired, and that while so at work with said engine, and in the exercise of all due care and caution for his own safety, he received the injuries complained of by reason of the said defective condition of the engine and counter-balance spring in the engine, as above stated. The word "not," in parenthesis, is omitted from this count of the declaration.

The circumstances surrounding the accident were, that on and prior to the month of August, 1907, the Belt Rail-

way Company was engaged in elevating certain tracks in the city of Chicago which it had leased from the Chicago and Western Indiana Railroad Company, lying between Eighty-third street and Archer avenue. Engine No. 32 was owned by the Chicago and Western Indiana Railroad Company. At the time of the accident the engine which the plaintiff was operating had been leased to the Belt Railway Company by the Chicago and Western Indiana Railroad Company and was being used and operated by the plaintiff in and about the track elevation work which the Belt Railway Company was then engaged in. The plaintiff had been in the employ of the Chicago and Western Indiana Railroad Company since 1883, was an experienced locomotive engineer, and continued in such employ until after August 12, 1907, when he received the injury which was made the basis of this suit. He was injured by the reverse lever flying forward and pressing his knee between the lever and a valve on the end of the engine boiler, fracturing his kneecap. This lever was situated on the right-hand side of the engineer in the engine cab and worked in a notched quadrant. A latch in the lever fits in the notches on the quadrant, and is let into the notches or released by a spring worked by a hand-grip on the handle of the lever. The lever is a long iron bar extending about four and one-half feet above the deck or floor of the cab, and is attached underneath the floor to a reach-rod extending about half way alongside the boiler and connecting with the arms of the tumbling-shaft. Heavy links are fastened to the tumbling-shaft, weighing approximately two hundred pounds or more, and when the lever is pulled back in the quadrant the links are elevated about their length and the engine is put in reverse. When the lever is pushed ahead the links go down and the tumbling-shaft goes ahead and the engine will go forward. The spring is cylindrical in form and encased in an iron casing located just back of the front pair of drivewheels and under the center of the boiler, midway between the

links referred to and the cab. The function of the counter-balance spring, as its name indicates, is to equalize the weight of the links and help in lifting them when the engine is being thrown in reverse, thus relieving the reverse lever of the weight of the links when the lever is pulled back in the quadrant in the cab of the engine. On August 10, 1907, while plaintiff was operating the engine he observed the lever would not stay hooked or locked in the quadrant when the engine was in reverse but would fly forward, and he was required to hold the reverse lever back in place with the weight of his body when backing up. On that evening when the plaintiff returned to the round-house he reported the defective condition of the counter-balance spring to Joseph Eisle, the night foreman in charge of the round-house and repair workshop for both defendants, and also wrote in a book, called the "work book," kept for the purpose of reporting defective conditions in the engines and other appliances, the following: "Engine 32, counter-balance spring in bad order; either weak or broken; engine will not stay locked in back motion; wants a new spring." Plaintiff testified that after he made the entry in the work book, Eisle asked him what was the matter with the engine, and he told him "the counter-balance spring is in awful bad shape" and "wouldn't stay hooked on the back motion at all;" that Eisle then asked him if he had put it in the book, and he told him he had, and Eisle then said, "Well, what more do you want?" to which plaintiff replied, "You do the work." The following day was Sunday, August 11, 1907, and plaintiff did not operate the engine again until the morning of August 12, 1907. When he returned to the round-house on that morning he saw he was marked on the bulletin to use engine 32, and thereupon inquired of Eisle if the work on the engine had been done. He was told by him that it had and was ordered to take the engine out and go about his work. The work book for the month of August, 1907, was not produced on the trial and these con-

versations between the plaintiff and Eisle were denied by
Eisle, but in view of the special finding of the jury on this
matter, and its approval by both the trial and Appellate
Courts, the statement of the plaintiff must be taken as true
as one of the controverted facts settled by the decision of
the Appellate Court. Plaintiff took the engine out about
six o'clock Monday morning and worked with it that day.
About nine o'clock in the forenoon he noticed that there
was something wrong with the reverse lever or the counter-
balance spring; that, as testified by plaintiff, it did not seem
to work just right and would go ahead easily and with con-
siderable force, and in that way acted very similar to the
way it had acted on the Saturday before. At times he
would hold it with his hand and at others also use the
weight of his body, the amount of weight required to keep
it in place depending upon the pressure of steam being used,
the higher the steam pressure the more the strength or the
weight being required to keep it in place when backing up.
The plaintiff had no difficulty in operating the engine in
this way until about 11:30 o'clock in the morning, when,
while backing several cars into the Fifty-first street yard,
he reached over to shut down the throttle to stop the engine
slipping and in so doing removed the weight of his body
from the reverse lever, when it flew forward, carrying his
leg with it and catching it between the reverse lever and a
valve on the boiler, fracturing and injuring his knee-cap.
Plaintiff did not discover that the counter-balance spring
had not been replaced by a new one until during the noon
hour, when he crawled under the engine and had the fire-
man work the reverse lever while he listened to the working
of the spring and heard the pieces of spring rattle in the
casing within which it was enclosed. The plaintiff used the
engine the remainder of the day, returning with it to the
round-house that evening about 6:45 o'clock. The "host-
ler," the man at the round-house whose duty it is to take
the water from the engine and draw the fires, testified that

he had difficulty in operating the engine that evening on account of the reverse lever slipping out and going ahead, and that the trouble was on account of the counter-balance spring. It is undisputed that no repairs were made to the counter-balance spring on the engine between the time the plaintiff complained of its defective and unsafe condition on August 10 and the time he again took the engine out of the round-house on the morning of August 12, the day on which he was injured.

In addition to their general verdict the jury returned the following special findings in response to the special interrogatories submitted to them, viz.:

(1) "Did the defendants promise the plaintiff to repair the counter-balance spring on engine No. 32 on the evening of August 10, A. D. 1907?" to which the jury answered "Yes."

(2) "If you answer 'Yes' to interrogatory No. 1, had a reasonable time elapsed in which repairs could have been made prior to the time Wheeler took said engine out on August 12, A. D. 1907?" This interrogatory was also answered in the affirmative by the jury.

Defendants contend that the court erred in not directing a verdict in their favor at the close of all of the evidence, for the reason, as they insist, that the evidence shows the plaintiff assumed the risk of injury from the defective condition of the counter-balance spring. The argument is, that the fourth count does not state a cause of action, and that the evidence does not support a recovery on the third count for the reason that it shows the plaintiff had notice of the defective condition of the counter-balance spring on August 10, and as the promise was to repair in a definite time, or at least within a reasonable time, and as the jury found a reasonable time had elapsed between the time of the promise to repair made on Saturday evening and the time of the taking out of the engine again by the plaintiff on Monday morning, plaintiff, by continuing work after

knowledge that the defective condition still existed, voluntarily assumed all risk of injury on account of such defective condition of the counter-balance spring.

Appellants further insist that appellee knew for several hours before he was injured that the counter-balance spring was out of repair and had not been repaired and that the engine was acting the same as it did the day before, and that therefore he did not rely either upon the promise to repair or the assurance that repairs had been made in his continued use of the engine up to the time of his injury, and, consequently, that the evidence fails to sustain the allegation of either the third or fourth count of the declaration. We think this a forced and strained construction of the evidence and not the construction most fairly deducible from plaintiff's testimony. He was the only one who testified as to his knowledge of the condition of the engine. His testimony is, that on Saturday evening he reported the defective condition of the counter-balance spring to the night foreman and also wrote it down in the work book, and that he was told on the Monday morning following, before taking the engine out, in response to his direct inquiry, that the engine had been repaired and was all right and was ordered to go out with it. He further testified that about nine o'clock that morning he noticed that the lever was not working just right, and that he was unable to tell whether it was because the counter-balance spring had not been repaired or because it was a new spring and needed further adjustment and tightening up. The evidence further shows that when new springs are put in they sometimes require tightening up or further adjusting after they have been in and used for a few hours, and that until that is done they will act in the way the spring in question acted on the morning of the accident. Owing to the location of the spring under the boiler and in a casing it was impossible for the plaintiff to ascertain by an ordinary inspection of the same whether or not the repairs had been made, as

he was told by Eisle they had been. The only way that the plaintiff could make any examination of the spring was by crawling under the engine and having the fireman work the lever backward and forward while he listened to its working in the casing. Even then he could not see the spring and would have to depend upon his hearing to ascertain what, if anything, was the matter with it. This the plaintiff did at his first convenient opportunity, which was during the noon hour, and he then learned for the first time, as he testified, that no repairs had been made to the counter-balance spring. This was after the accident happened. Had he obtained this knowledge before the accident a different question would be presented. That the danger encountered in operating this engine with a defective counter-balance spring was not so great or imminent that a man of ordinary prudence would refuse to continue in the service and to use the same until the defect had been remedied we think is clearly demonstrated by the testimony of appellants' witnesses, some of whom claimed to have used the engine in its then condition for nearly a year after the time of the accident to the plaintiff happened. There can be no doubt, after considering all of the evidence, that had the plaintiff not been deceived by the assurance in the morning that the repairs had been made he would have been able to run the engine as he did before, without injury to himself.

Appellants cite a number of cases to the effect that where the master promises to repair within a fixed time or within a reasonable time and neglects so to do, and the servant thereafter continues in the employ and uses the defective machinery or appliance without further complaint and assurance from the master that the same will be repaired, he assumes the risk incident to the use of the machine or appliance in its then defective condition. Among the cases cited are the following: *Illinois Steel Co.* v. *Mann,* 170 Ill. 200, *Gunning System* v. *Lapointe,* 212 id. 274, and *Cromer* v. *Borders Coal Co.* 246 id. 451. There can be no

question as to the correctness of the rule announced in those cases, but that rule is not controlling here, for the reason that no definite time was fixed in which the repairs were to be made, and the evidence further shows that plaintiff was not only relying upon the promise to repair, but was also relying upon the assurance by the master that the repairs had been made, and did not discover until after his injury that they had not been made. In Thompson on Negligence (sec. 4669) the rule as to continuing to use a defective appliance is stated, as follows: "If, after notifying the master or his representative of a defect or danger, the servant receives the promise that it shall be repaired and is afterwards required to use it without having an opportunity to examine to see whether it has been repaired, he is not, by reason of thereafter using it, held to have assumed the risk. The same rule obtains where the defect is not apparent upon a casual inspection, in which case the servant is not required to inspect the machinery or appliance before again using it, in order to ascertain whether or not the promised repairs have, in fact, been made, unless there is something in the condition of it which would cause an ordinarily prudent man to make such an examination. And where the servant is told that a defect has been repaired by someone authorized to make the repairs, and he acts on the belief that such repairs have, in fact, been made, and is injured, he is not, it has been held, charged with an assumption of the risk." *Odin Coal Co.* v. *Tadlock,* 216 Ill. 624.

Counsel in their briefs have discussed at length the questions of assumed risk and contributory negligence. They do not agree fully as to the application of the rules of law to these two questions. Both questions may arise under the facts of a case, yet they are separate and distinct. The question of contributory negligence may be involved in every action brought for personal injury, while that of assumed risk only arises by virtue of employment or by continuance in such employment with knowledge of a defect

or danger. (*Chicago and Eastern Illinois Railroad Co.* v. *Heerey*, 203 Ill. 492; *Knox* v. *American Rolling Mill Corporation*, 236 id. 437.) The law has long been settled in this State that the servant, when he engages in an employment, does so in view of the risks incident thereto. He will be presumed to have contracted with reference to such risks, and to have assumed the same, if he receives an injury resulting from the incidental risks and hazards ordinarily connected with the employment. (*Chicago and Eastern Illinois Railroad Co.* v. *Heerey, supra.*) Extraordinary risks,—that is, risks which may be obviated by the exercise of reasonable care on the master's part,—are not assumed by the servant unless they are, or ought to be, known to and comprehended by him. The servant assumes all the ordinary risks of the service and all the extraordinary risks of which he knows and the dangers of which he appreciates. (3 Labatt on Master and Servant,—2d ed.— secs. 1178, 1179, 1186a.) The general rule in this State is, that the servant will be regarded as voluntarily assuming the risks resulting from the use of defective machinery if its defects are as well known to him as to the master. He assumes the risk of known dangers and such as are so obvious that knowledge of their existence is fairly to be presumed. (*Chicago Drop Forge and Foundry Co.* v. *Van-Dam*, 149 Ill. 337; *Pittsburg Bridge Co.* v. *Walker*, 170 id. 550.) Not only the defects, but the dangers, must be known to him. (*Union Show Case Co.* v. *Blindauer*, 175 Ill. 325; *Illinois Terminal Railroad Co.* v. *Thompson*, 210 id. 226.) But where the danger arising from the defect would be obvious to a person of ordinary intelligence the law will charge him with knowledge of the danger. *Chicago and Eastern Illinois Railroad Co.* v. *Heerey, supra.*

"Contributory negligence is the omission of the employee to use those precautions for his own safety which ordinary prudence requires." (*Schlemmer* v. *Buffalo, etc. Railway Co.* 220 U. S. 590.) "The conception underlying

the servant's assumption of a known risk is essentially that of an implied agreement to accept the responsibility for any bodily hurt which may result from his exposure to that risk. The theory upon which contributory negligence is held to preclude him from recovery is that he is guilty of imprudence in the premises, and that this imprudence is entirely, or partially, the cause of the injury." (3 Labatt on Master and Servant,—2d ed.—sec. 1219. To the same effect, 8 Thompson on Negligence, [White's Supp.] sec. 4611.) Labatt, in the section just quoted from, states that the two defenses, although distinct, come very close together in a very large class of cases in which there is an allegation that the danger was so great and imminent that. a reasonably prudent person would not incur it.

Where a servant continues to work after learning he is exposed to extraordinary danger arising from a defective condition of some instrumentality used by his master, there may be presented both the question whether he has elected to include the additional risk among those which he is deemed to have accepted by virtue of his contractual relations, and the question whether, under the circumstances, he has used prudence in remaining in the position where he will have to incur the new hazard. If he receives an injury owing to the existence of the peril which has thus become known to him, it is open to the master to rely either upon the defense of assumption of risk or upon the defense of contributory negligence. (See the discussion of this question in note to *Illinois Steel Co.* v. *Mann,* 40 L. R. A. 781.) This court has held that the question of assumed risk does not arise where a servant performs dangerous work in obedience to the master's command, the question in such case being one of contributory negligence, depending upon whether the danger was so great that a person of ordinary prudence would not have incurred it. (*Springfield Boiler Co.* v. *Parks,* 222 Ill. 355, and cited cases.) The United States Supreme Court has held, in discussing this

question, that the assumption of risk, in the broad sense, shades into negligence as commonly understood; that "negligence consists in conduct which common experience or the special knowledge of the actor shows to be so likely to produce the result complained of, under the circumstances known to the actor, that he is held answerable for that result although it was not certain, intended or foreseen. He is held to assume the risk upon the same ground." (*Schlemmer* v. *Buffalo, etc. Railway Co.* 205 U. S. 1.) The authorities are not in harmony in all jurisdictions as to the general treatment of these subjects, but in this State, and by the weight of authority in other jurisdictions, the doctrines of assumed risk and contributory negligence are separate and distinct, one resting on contract, express or implied, and the other on some fault or omission of duty by plaintiff.

The risk from a defect is not assumed by the servant where he calls the attention of the master to it and is assured it will be repaired, and he may remain in the service for a reasonable time under that assurance. In such case the question is one of contributory negligence on the part of the servant, depending upon whether the danger was so great that an ordinarily prudent person would not have encountered it. (*Chicago and Eastern Illinois Railroad Co.* v. *Heerey, supra.*) Under this rule appellee here was not liable for any assumption of risk from the time he went to work with the engine Monday morning until he found that the lever was not working well, about nine o'clock that forenoon. He had a right to rely on the promise and continue in the service for a reasonable length of time although he had full knowledge of the defect. (3 Elliott on Railroads,—2d ed.—sec. 1295.) It would be a question for the jury what was a reasonable time, and the jury here found that appellants had a reasonable time after making the promise in which to make the repairs. On the facts here, however, appellee need not rely, alone, on the question of promise to repair. He was told in the morning,

when he went to work, that the engine had been repaired. He had a right, therefore, to rely on that assurance until he found that the engine had not been repaired.

Counsel on both sides discuss the question as to whether appellee could rely on the promise of repair, or assurance that it had been repaired, after he discovered that the lever was working improperly. Admitting, for the purposes of this case, that counsel for appellants are right in contending that he could then no longer rely upon the promise to repair or on the assurance that the repairs had been made, and that in continuing his service and the use of the engine he must be held to have done so under the same circumstances as if no assurance of repair had been given him or no promise had ever been made, was it the duty of appellee to quit his employment as soon as he ascertained the defective working of the lever? His evidence shows that he did not know what the defect was until he examined the engine after the injury. While it is true, in a sense, that the defect was known to him, it is obvious from his evidence he could not comprehend fully the risk that he was undertaking by remaining at work with his engine. At the most, under the authorities the question as to whether he · assumed the risk, under the circumstances shown by the evidence, was one of fact for the jury. It could not be said, as a matter of law, that the evidence showed that he understood the danger to which he was thereby exposed. In order to hold that it is a question of law that he assumed the risk it must have been shown that he possessed a "sufficiently exact appreciation of the nature and extent of the danger in question to enable him to estimate the possibilities of his environment in so far as they affected his bodily safety." (3 Labatt on Master and Servant,— 2d ed.—sec. 1190.) Furthermore, this same author, in section 1196 of the same volume, states that the servant does not necessarily become chargeable with assumption of risk because he does not leave the employment immediately after

he ascertains the existence of a dangerous defect; that it cannot be reasonably disputed "that the master himself would often be benefited, rather than prejudiced, by the servant's knowledge that he would not lose his right of action by continuing to work for a short period in cases where sudden abandonment of his duties would inflict appreciable damage upon the business," citing, among other cases, in support of that doctrine, *O'Rorke* v. *Union Pacific Railway Co.* 22 Fed. Rep. 189. In that case the late Mr. Justice Brewer, in discussing the question whether an employee of a railroad company should stop work at once on discovering a defect, said, on page 191: "I do not think that the urgency can be forced upon an employee so quickly as that for deciding,—that he cannot be called upon, at the instant, to stop work if he sees there is danger. Suppose an engineer running a train between the point of departure and the point of terminus finds that his engine is out of order; can he stop right there and say he will stop until the injury is mended? It would not be safe to do this. He must carry the defective engine to its point of destination. No other rule would be safe. And so, generally, a man cannot be called upon at the moment to say, 'There is a defect or there is a danger, and I will stop.' He has a right to wait a reasonable time,—to consider the circumstances of the case and to give notice to his employers that he is in danger," etc. In *Fordyce* v. *Edwards*, 60 Ark. 438, it was held that if an engineer, without fault on his part, first discovered the condition of the pilot on the engine after he commenced his trip and the defect was not such as to render the engine immediately dangerous, he would not be required to abandon his engine nor lose his right to recover by continuing on his journey until he reached a station where the defect could be cured or a new engine obtained, provided the defect was such that it was reasonable to believe that the engine might still be safely operated by the exercise of great care and the risk was

not greater than a person of ordinary prudence would have taken under the same circumstances. In discussing the doctrine of contributory negligence of an employee, Labatt, in his third volume of Master and Servant, (2d ed. sec. 1216,) says: "The case of a railway servant stands upon a special footing, as he is deemed to owe a duty to the public as well as to his employers, and the effect of the decisions, as a whole, is, that he is justified in taking much greater risks than employees in other occupations without necessarily forfeiting his right of action. Under ordinary circumstances such a servant seems to be, at all events, entitled to remain at work until he obtains an opportunity of notifying the proper agent of the master as to the existence of the danger. It is only in very extreme circumstances that he will not be warranted in remaining on a train until it reaches the next station. But the exigencies of railway traffic will not excuse the servant for running the risk of almost certain injury." In addition to the authorities already cited, see, as supporting this conclusion of the author, *Kane* v. *Northern Railway Co.* 128 U. S. 91; *Irvine* v. *Flint and Pere Marquette Railroad Co.* 89 Mich. 416; *Pierson* v. *New York, New Haven and Hudson River Railroad Co.* 65 N. Y. Supp. 1039; *Louisville and Nashville Railroad Co.* v. *Kelly,* 11 C. C. A. 260; *Flynn* v. *K. C., St. J. & C. B. Railroad Co.* (Mo.) 10 West. Rep. 418; *Northern Pacific Railway Co.* v. *Mares,* 123 U. S. 710.

The questions of assumed risk and contributory negligence are questions of fact, ordinarily. They only become questions of law where, from the facts admitted or conclusively proven, there is no reasonable chance that reasonable minds would reach different conclusions. (*Clark* v. *Chicago, Rock Island and Pacific Railway Co.* 231 Ill. 548.) The circumstances under which persons are placed must necessarily be considered to determine the question as to either assumption of risk or contributory negligence. Under the circumstances of this case it cannot be held, as a

matter of law, that appellee assumed the risk of injury or was guilty of contributory negligence by failing to stop work the instant he found the lever was working improperly on the forenoon of the injury. The questions of assumption of risk and contributory negligence were in this case both questions of fact to be submitted to the jury under proper instructions. Considering all the instructions together, we find no error in that regard.

In our opinion the omission of the word "not" from the fourth count of the declaration was not fatal to a recovery on that count after verdict. A reading of the whole count leaves no room for doubt as to its real meaning, and when the same is considered in connection with the evidence and the instructions of the court there can be no question but that the jury understood that in order for plaintiff to recover under that count the jury must find, from the evidence, that plaintiff did not know, up to the time of the injury, that the repairs had not been made on the engine. The whole record shows the count was so treated by all the parties to the suit until after the jury returned their verdict, as both parties in their instructions treated the count as so alleging and submitted instructions to the jury declaring the rules of law applicable to the evidence admissible under such a count. Where both parties to a suit submit instructions declaring the rules of law applicable to the facts proven and request the jury to return their verdict in accordance with those rules of law as applied to the facts proven, neither party can be heard to complain that such facts were not within the scope of the allegations of the pleadings under which those facts were permitted to be proven. (*Illinois Steel Co.* v. *Novak,* 184 Ill. 501; *Illinois Central Railroad Co.* v. *Latimer,* 128 id. 163; *Chicago and Alton Railroad Co.* v. *Harrington,* 192 id. 9; *Donk Bros. Coal Co.* v. *Stroetter,* 229 id. 134.) We think the Appellate Court was right in holding that the omission of the word "not" from this count was cured by verdict and that

the plaintiff could recover, on the facts proven, under the fourth count of his declaration.

It is further insisted that the court should have directed a verdict as to the defendant the Belt Railway Company, for the reason that the evidence shows the plaintiff was in the employ of the Chicago and Western Indiana Railroad Company and not of the Belt Railway Company, and that the relation of master and servant was not shown between the plaintiff and the latter company. With this contention we do not agree. The evidence is that the employees and the tools and appliances of the one company were used and employed indiscriminately in the business of the other; that especially the superintendent of the round-house, the night foreman and the day foreman, from whom the plaintiff received his orders, were in the employ of both companies; that the Chicago and Western Indiana Railroad Company was known by the name of Belt Railway Company in the city of Chicago and by the name of Chicago and Western Indiana Railroad Company outside of the city of Chicago; that the engine on which the plaintiff was working, although owned by the Chicago and Western Indiana Railroad Company, was marked with the name of the Belt Railway Company, and that the tracks upon which plaintiff was at work, although owned by the Western Indiana Railroad Company, were under lease to the Belt Railway Company and were jointly used by both companies. The law is well settled that a general servant of one master may be lent or hired to another for some special purpose and in that way become the servant of the latter in the particular transaction. (*Consolidated Fireworks Co.* v. *Koehl,* 190 Ill. 145; *Harding* v. *St. Louis Stock Yards,* 242 id. 444.) Neither do we think that the Belt Railway Company is in a position to raise this question at this time. Both parties joined in the plea of general issue, which was the only plea filed to the declaration charging that plaintiff was in the employ of both of these defendants. The filing of only the plea of

general issue was an implied admission by the defendants that the plaintiff was operating the engine as their servant and employee, (*Chicago and Eastern Illinois Railroad Co.* v. *Schmitz,* 211 Ill. 446; *McNulta* v. *Lockridge,* 137 id. 270;) and there was ample evidence in the record from which the jury were justified in finding that such was the fact, notwithstanding the two railroads were incorporated as separate legal entities. Besides the foregoing evidence plaintiff and a number of other witnesses who did the work for both companies testified that they were in the employ of both companies. Under the evidence in this record we think that there was no error in rendering judgment against both defendants.

It is also insisted that defendants were prejudiced by the manner in which some of the medical experts were permitted to be examined by counsel for plaintiff, in that they were asked, and permitted to answer, whether or not they saw any connection between the injury to the leg on August 12, 1907, the condition that followed and the present condition, and gave it as their opinion that the violence of the alleged accident resulted in the present condition. There was no dispute but that the plaintiff was injured in the manner claimed, and the questions asked therefore only called for a scientific or expert opinion as to whether or not the present condition was the result of the injury complained of. This method of examination is permissible. *City of Chicago* v. *Didier,* 227 Ill. 571.

It is further insisted that the court erred in refusing to allow the defendants' physicians to examine the plaintiff's leg in the presence of the jury, the argument being, that since the plaintiff exhibited the injured member to the jury the defendants' physicians had a right to make a physical examination of the leg then, the same as they would have to examine any other exhibit in the case. It does not appear from the record that any examination of plaintiff's leg was made in the presence of the jury other than the

mere exhibiting of the same to the jury. We do not think the mere showing of the injured member to the jury gave the defendants the right to invade the privacy of plaintiff's person and make him submit to an.extended scientific examination of the same in the presence of the jury. When the defendants requested the right to have the plaintiff examined by their experts the plaintiff offered to submit to an examination by the same physician of defendants who had previously examined and treated him for his injury. It appeared from the evidence that the first physician he consulted after the injury was the defendants' physician, Dr. Webster, and that he was treated by him and one of his assistants for some time after the injury, and that his injury was diagnosed by Dr. Webster as a transverse fracture of the knee-cap, and the injured member was treated by Dr. Webster and his assistants for such injury. We think that the offer made was fair, and that the court did not err in refusing to require the plaintiff to submit to a further examination by other physicians to be selected by the defendants.

It is also insisted that the defendants were prejudiced by the fourth and thirteenth instructions given at the instance of the plaintiff and by the refusal to give the twelfth instruction tendered on behalf of defendants. The criticism made of the plaintiff's fourth instruction is, that it told the jury that if they found, from the evidence, that the plaintiff had proven his case as alleged in this declaration, and did not assume the risk, whatever risk there was, if any was shown by the evidence, they could find their verdict for the plaintiff. The objection urged is, that neither the instruction nor the declaration defines assumed risk as applied to the facts in this case or alleges that the danger to which the plaintiff was exposed in using the defective appliances was not so imminent that a person of ordinary prudence, in the exercise of ordinary care for his own safety, would not have refused to incur the same by using

the engine in the condition it was then in. These features of the case were fully covered by other instructions in the series, and there was no evidence in the record upon which to base a finding that the danger was so imminent that a man of ordinary prudence would not have incurred the same. The declaration alleged that the plaintiff was in the exercise of due care and caution for his own safety, and, under this instruction, before the jury could find their verdict for the plaintiff they must find that he did not assume the risk and that he was in the exercise of due care and caution for his own safety. These allegations were sufficient to negative any assumption that the jury could find a verdict for the plaintiff if they believed that he was in any way guilty of contributory negligence which approximately contributed to the injury. Instructions have been repeatedly approved telling the jury the plaintiff was entitled to recover if he had proved the negligence charged in the declaration or some count thereof. *Scott* v. *Parlin & Orendorff Co.* 245 Ill. 460.

The objections urged by the defendants to the thirteenth instruction given on behalf of the plaintiff are, (1) that it told the jury that if they found, from the evidence, that the defendants *expressly* or *impliedly* promised to repair the engine on the evening of August 10, etc., and thereafter assured the plaintiff that the engine had been repaired, the plaintiff had a reasonable time after discovering that it had not been repaired, if such was the fact, within which to return the engine, and (2) that what was a reasonable time should be determined by the jury from a consideration of all the facts and circumstances in evidence, under the instructions of the court. The first objection urged was cured by the special finding of the jury, in which they found the defendants promised to repair the engine on the evening of August 10. As the jury so found, it makes no material difference whether the promise was express or implied, if such promise was made. The other objection urged to the

instruction is, that it tells the jury that the plaintiff had a right to continue to use the engine for a reasonable time, regardless of whether using it was the incurring of such an imminent danger that an ordinarily prudent man would not encounter the same. The instruction was undoubtedly offered to meet the contention of the defendants that it was the duty of the plaintiff to stop working with the engine immediately on his discovery, before the accident, that the engine was not working just right. The evidence shows that the plaintiff did not actually know the spring was still defective until he crawled under the engine and listened to the working of the spring after the accident. There was no question of imminent danger until that time, which was after the accident happened. While the instruction was not altogether necessary, we do not think the jury were misled thereby. We also think these features of the case were fully covered by the ninth instruction given at the instance of the defendants, by which the jury were told that if they found, from the evidence, the engine was defective and the defendants promised to repair the same but such repairs were not made, and if they further found that the danger of continuing in the operation of said defective engine was so imminent that an ordinarily prudent person in like circumstances would not continue in operating the engine, then the plaintiff was guilty of negligence in continuing to use it and could not recover.

The twelfth instruction offered by the defendants was not based on or applicable to the evidence and was therefore properly refused.

Finding no substantial error in the record the judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*