**Fred Genzel, Administrator of the Estate of Charles Wellman, Deceased, Appellee, v. New York, Chicago & St. Louis Railroad Company, Appellant.**

**Gen. No. 8,424.**

Opinion filed November 18, 1930.

H. M. STEELY and H. M. STEELY, JR., for appellant; JOHN B. COCKRUM and J. T. MARKEY, of counsel.

H. ERNEST HUTTON and LOUIS J. BREMER, for appellee.

MR. JUSTICE NIEHAUS delivered the opinion of the court.

This action was brought by Fred Genzel, the appellee, as administrator of the estate of Charles Wellman, deceased, under the Federal Employers' Liability Act, for the benefit of the next of kin of the deceased, in the circuit court of Vermilion county, against the New York, Chicago & St. Louis Railroad Company, appellant, to recover damages for the alleged wrongful causing of the death of Wellman, which occurred on June 18, 1926. The deceased was an employee of the appellant; and at the time of his

death was acting as flagman for an extra gang of workmen who had been at work for several weeks putting in new ballast in the appellant's roadbed; also some new tracks between Ellsworth and Padua, stations on appellant's railroad; and on the day referred to, was working on the railroad track just west of Padua; and were putting in new rails at that point. The deceased, upon assuming his duties as flagman, to signal trains coming toward Padua, received particular directions from the foreman of the extra gang of workmen with reference to placing torpedoes on the tracks as warning to trains; and he was directed to proceed towards Ellsworth, the next station east, and to the top of a hill which was about a mile east of Padua, and here to place two torpedoes on the rails, two rail lengths apart; then to come back to a point near the highway crossing located some distance east of Padua. And the deceased thereupon started out to perform the duties assigned to him as flagman; and apparently to carry into effect the directions given him by the foreman. It is evident that the deceased had gone to the top of the hill, and had placed two torpedoes on the rails there; but no one appears to have seen him after he had started out in the performance of his duties until he was discovered suddenly by the fireman on the engine of the westbound local passenger train which caused his death, just before the train struck him. He was then lying on the railroad track on which the westbound train was running; and against the south or outside rail of the track, about 46 feet from the west end of an S curve in the track; and at a point 888 feet east of the center of the highway crossing east of Padua, about opposite a wild cherry tree located near the railroad track.

The evidence does not show any reasonable explanation to account for Wellman being in the perilous position in which he was discovered, except that he

may have been overcome by some ailment which appeared to affect him on the morning he started out to perform his duties as flagman.

On a previous review of this case concerning errors which are not now involved, the case was reversed and remanded. 254 Ill. App. 624.

Upon reinstatement in the court below, the case proceeded to another trial, on three amended counts of the declaration charging negligence, namely, the fourth additional count, the seventh additional count and the eighth additional count. In defense the appellant filed the general issue and two special pleas; one special plea alleging contributory negligence and the other based on the defense of assumed risk. The jury found a general verdict of guilty, and assessed the appellee's damages at $5,000, whereupon the court rendered judgment. This appeal is prosecuted from the judgment.

A number of questions are presented for review on this appeal. It is contended that the verdict is against the weight of the evidence; and that the jury were not warranted in finding the appellant guilty of negligence.

The seventh additional count of the declaration contains the following charges of negligence against the appellant:

"It avers that between said villages, for four weeks next prior to the date of the accident, servants of defendant, called gang or crew, of the number of to-wit: twenty men, among whom was Charles Wellman, were employed in taking up, replacing and relaying rails and ties in said main track, and working on the roadbed thereunder, and in making repairs, and that during the progress of such work one of said section men would be sent out to act as flagman of such trains approaching along said main track, daily, for the entire day, and had by defendant been stationed

along said main track at different points, one and one-half miles in each direction from the place where said section crew were working, and on June 18, 1926, and for every third day for sixty days previous one of said flagmen had been stationed at different points on said railroad one and one-half or two miles east of said village of Padua, and on said date, at nine o'clock in the morning, Charles Wellman, was by defendant, stationed to act as flagman along said main track at a point one mile east of Padua, and he, the said Charles Wellman, then and there was lying, reclining, or sitting, asleep, sick or resting, upon, next to and against the rail and ties of said main track, in such position that he would be struck and injured or killed by trains passing along said main track.

"Further avers that in the repair work on said track and railroad on said date, and for sixty days prior thereto, at a point a mile east, and another point two miles west of where Wellman then and there was, the defendant had placed cautionary signals called 'slow speed sign' consisting of a post, to-wit: nine feet from the ground, supporting on top a large board three feet by six feet on which was printed the word 'Slow' in large letters twelve inches high, and which slow speed signs were conspicuously placed upon the right and adjoining the track, and were placed where they were clearly visible to the engine crew of the train approaching same in the day time, from the great distance of to-wit: one mile.

"Further avers that defendant in its business had certain rules and regulations prescribing the duties of its servants operating its said trains, and that in said rules it was provided, among other things, that a 'fixed signal' was a signal of fixed location, indicating a condition affecting the movement of trains, and that a board called 'slow speed sign' indicated slow speed, with the name of 'slow speed sign,' and with

a location at the point to be protected, and upon the right and adjoining the track to which it refers, and which said slow speed sign had printed upon it in large letters the word 'slow' and which slow speed sign was the said cautionary signal so stationed to the east and west of where Wellman was located.

"Further avers that it became and was the duty of defendant, by its servants running and propelling the said train toward Wellman to use reasonable care and diligence to keep the same at slow speed after reaching said slow speed sign to the east of said Charles Wellman, until the train had reached and passed where he was; but that in violation of said duty the engineer and fireman so propelled said train, and carelessly and negligently drove and operated same, up to and past said slow speed sign east of where Wellman was located, at a high and dangerous speed, . . . in consequence of which said train struck Wellman with great force and violence, . . . and in consequence of being so struck said Charles Wellman was so severely injured that within one-half hour thereafter he died."

The charge of negligence in the count referred to constitutes the main controverted question in the case. The record discloses a sharp conflict in the testimony of the witnesses for the appellant and the witnesses for the appellee concerning the issue presented by the count mentioned.

It is insisted by the appellee that the evidence shows that on the day Wellman met his death, there was a "slow board" sign on the east end of an S curve; and on the northerly side of the appellant's railroad track; on the side used by the engineer in managing the train; and that this "slow board" sign, under the rules and customary operation of appellant's trains required the engineer to slow down the speed of the train; but that the engineer negligently failed to ob-

serve the requirements of this "slow board" sign; and check the speed of the train; but kept on running as if the "slow board" sign had not been there; and that in consequence, he was unable to stop the train in time to prevent it striking Wellman after he had notice of Wellman's presence on the track, near the west end of the curve referred to.

It is appellant's contention, that the "slow board" sign was not at the east end of the curve, but had been moved farther west and past the point of the accident. The engineer who propelled and managed the train testified as follows:

"As I went west through the curve I didn't notice any boards or signs on the engineer's side except a whistling post. That whistling post is a mile east of Padua."

Harry Fry testified concerning the controverted question of the location of the "slow board" sign, as follows:

"I am twenty-five years old and live at Ellsworth and have lived there all my life. I am a farmer. On June 18, 1926, I was working for Charles Kimerly on a farm northwest of Ellsworth, doing farm work. I know where the curve is between Ellsworth and Padua, and where the east end of the curve is. On June 18, 1926, about nine o'clock in the morning, I was working in an oats field right north and along the railroad track. . . . A little west of the east end of the curve. . . . I saw this train the morning of June 18th. It came from the east while I was cutting weeds there. . . . I first saw it coming west of Ellsworth. Just for a moment. . . . I saw it when it came opposite me. . . . As to the speed as it entered the east end of the curve that day, I observed it for about 200 feet. . . . In my judgment its speed when it entered the east end of the curve was 35 miles an hour. . . . As to whether there were any railroad boards or signs of

any kind along that railroad on this day, there was a slow board there a little past the east end of the curve on the north side of the railroad track about eight or ten feet. It is about eight or ten feet high and about four feet square, and had the word 'slow' on it. It is about four feet high from the ground up to the board. It was on a post, and the top of the post was about six feet high. The same board was there a few days before and a few days afterwards.''

Glenn Bell who was one of the construction gang who was working on the day of the injury testified concerning the location of the slow board referred to, as follows:

''There was such boards in use on June 18, 1926, the day Wellman was killed. There was one board. I don't know what the system was in reference to those boards. This board was at the east end of the S curve, just around the curve a little ways. It was off on the north side of the railroad track six or eight feet, standing up on a post about eight feet high I expect, and the board was about four feet square, and on the board was the word 'slow.' No other words. The board was painted yellow, and the letters in black. Pretty good sized letters, six inches high, anyway. I don't know whether it was stationed there at the time Charles Wellman was killed. . . . I didn't see the board on that day at all. I saw it a couple of days afterwards. . . . I had seen that board on the east end of the curve before the accident, a couple of days before.''

Cova Curry, also one of the construction gang working on appellant's railroad on the day of the injury, testified concerning the location of the slow board as follows:

''I know where the S curve is between Ellsworth and Padua. There was a board at the east end of the curve on the north side of the railroad track. I don't

know how far from the track. I judge five or six feet. It was a board on a pole, six or seven feet high, and the board was about four feet square and faced the east. The board extended north and south and had on it the word 'slow.' The color of the board was yellow, and the letters were black. When I saw it there was nothing else on it but the word 'slow.' The letters were eight or ten inches high up and down, and sideways about an inch and a half or two inches. As to whether that board was there on June 18, 1926, I suppose it was. I saw it afterward when we were going home on Saturday after this Thursday. I had seen it there before the 18th once.''

Lew Curry testified concerning the location of the slow board as follows:

''I live at Hoopeston, Illinois. I am forty-three years old. I was employed in different places in June, 1926. I worked for the railroad some that year. . . . I was working there before the day of Wellman's death and had been for about two or three weeks. . . . I know where this S curve between Ellsworth and Padua is. There was a board alongside of the railroad at the east end of the curve on the day of his death. It was on the north side of the track and about five or six feet from the track. It was on a post five or six feet high. It was a square board I judge two and one half or three feet. It was painted yellow on the east side, and had in black letters 'slow.' There was nothing else on the board. It was put there when we commenced work, and it was there after the accident, at the same place, the next day afterward. It seemed to be the same board.''

Bernard C. Davis, who was employed as a flagman working with the construction gang that was doing repair work on the railroad track between Ellsworth and Padua, testified concerning the location of the slow board on the day of the accident, as follows:

"In that work some slow boards were used. A slow board is a signal for the train to slow down within controlling power within the length of the train. Just one slow board was used, that is, one at each end. The work on the rails was done west of this S curve. There was a slow board stationed for trains coming to the west and that was east of the bend. For trains from the west going east there was another slow board at the west end. For trains going east the slow board was on the south side, and for trains going west it was on the north side. It had the word 'slow' on the board, and the board was yellow, with black letters. Its size was about two feet eight inches by four feet, and it was placed on a post six feet in the air, and for a train coming from the east the slow board faced to the east. At the top of the board was a lantern for night signaling that would be seven and one-half or eight feet high. The boards were placed six feet from the outside of the rail, in the vision of the engineer, and just about on a level with the cab window."

The same witness also testified as follows:

"After the accident I was sent out to take Wellman's place. . . . That afternoon a representative of the railroad came up to where I was after I had taken Wellman's place. It was Mr. Gard, the road master from Bloomington. . . . He walked up the track going east from Padua and came up where I was. I was at the cherry tree when he got there.

"I saw the same board after the accident, and when I saw it Mr. Gard was there. I saw it immediately after he got there, the slow board. I was standing at the west end of the curve, I could see the slow board from the west end of the curve."

In contradiction of the evidence adduced by the appellee, concerning the kind of slow board in use at the time of the accident, and its location, the appellant called the witness Ward Dawson who testified that he was in the employ of the appellant as section fore-

man at the time of the accident, and had charge of the construction gang which had been working in and about Ellsworth and Padua. He testified about the kind of a slow board in use at that time, as follows:

"Yes sir, there was a slow board used at all times during our work. It was a big yellow board and had on it reduce speed. I am familiar with Rule 720. There was no board of that kind used on the work at any time during the work with just the word 'slow' on it. The board we used was the board designated by Rule 719, and we moved that board as we worked west. When we first started work, it was placed near Ellsworth, and there was a time when it was placed down near the east end of the curve, and on the day of the accident that board was about eighty rods west of the highway. . . . There was no board of the kind mentioned in our Rule 720 at the east end of the curve, and no board at any place in the curve at all outside of the whistle sign. Myself and two men placed that board there at the culvert, and we took it down there from the east end of the curve. We did that about four days previous to the accident. . . . The sign board, or reduce speed sign, had on it there, 'reduce speed to ten miles an hour.' . . . When a board of this kind, 'reduce speed sign' is used, that is a sign to the engineer that at about 3000 feet from that slow board there are men working, and he had to have the train under control. It does not mean that he should come up to that board with the train under control and down to ten miles an hour. At whatever rate of speed he is traveling at, it means that from that point for 3000 feet, he should be down to the speed that's on the board, and if there is no speed written on the board, he should be down to ten miles an hour. He has 3000 feet to do that in."

George W. Redd, the conductor on the train that caused Wellman's death, testified concerning the slow board, as follows:

"As I went west from Ellsworth to where the accident happened, there was no slow board out on the north side of the track that I saw."

And on cross-examination he testified:

"I was in the coach, and was not looking for a slow board, and don't know whether there was any at the east end of the curve or not. There was a slow board by the culvert. No sir, I wasn't watching for that board. I only know it was a slow board from the general appearance, I saw the back side of that board as the train went by. I don't know what was on the east side of it."

J. A. Gard, the roadmaster in the employ of the appellant, testified as follows:

"In June, 1926, I lived in Bloomington, Illinois, and had charge of the track department from Templeton, Indiana to Peoria, Illinois. . . . I recall this work that was going on between Ellsworth and Padua, and west of Padua. . . . On June 18, 1926, the day of this accident, I went out there in an automobile. I left Bloomington between eleven and twelve o'clock, and the men had gone to work at the time I got to Padua. That day they were working west of Padua. When I got to Padua I walked east to the top of the hill and to the east end of the job, around through this curve to the east, and went by the cherry tree, clear through the curve to the east end of the job. . . . There was no slow board on the north side of the track east of that cherry tree that day. There was a slow board pretty near the culvert west of the highway about 800 feet. Its color was yellow and it had on it 'reduce speed ten miles an hour.' It faced to the east. There was no other board out that day on the north side of the track between Ellsworth and Padua."

The matter of the weight of the evidence concerning the kind of "slow board" used on the day of the accident, and as to its location, east or west of the place of the accident, were questions for the jury to

pass upon and involved the determination of the credibility of the witnesses for the respective parties, concerning the controverted matters of fact. It is evident that the conclusion arrived at by the jury in that regard was that the greater weight of the evidence was on the side of the appellee. This court would not be justified in saying, in view of the proofs made, that the jury were not warranted in reaching this conclusion; and it is clear that the verdict on the controverted points referred to is not manifestly against the weight of the evidence. Taking this view of the evidence, the jury was warranted in drawing the inference, that the failure of the engineer to observe the requirements of the "slow board" sign may have been the cause of the accident.

Error is also assigned on the first instruction given for the appellee, and on the modification and refusal of instructions presented by the appellant. Concerning the first instruction, the appellant contends that "it entirely ignored the question of assumed risk by Wellman, contended for by the appellant, which had been pleaded in the case as a defense; that it also ignored the defense of Wellman's alleged contributory negligence which appellant contends, was the sole cause of the accident." Concerning these contentions, it is pointed out, that while the appellant pleaded "assumption of risk" as a defense to appellee's right of recovery, the evidence does not show, nor tend to show, any facts upon which the doctrine of "assumption of risk" as generally defined, could be predicated. In *Wheeler v. Chicago & Western Indiana R. Co.*, 267 Ill. 306, our Supreme Court clearly defined the doctrine as generally recognized by courts of review concerning the elements necessary to constitute this defense, as follows: "The law has long been settled in this State, that the servant, when he engages in an employment, does so in view of the risks incident thereto. He will

be presumed to have contracted with reference to such risks, and to have assumed the same, if he receives an injury resulting from the incidental risks and hazards ordinarily connected with the employment. . . . Extraordinary risks,—that is, risks which may be obviated by the exercise of reasonable care on the master's part,—are not assumed by the servant unless they are, or ought to be, known to and comprehended by him. The servant assumes all the ordinary risks of the service and all the extraordinary risks of which he knows, and the dangers of which he appreciates. (3 Labatt on Master and Servant,—2d ed.—secs. 1178, 1179, 1186a.)'' In the same case, the court also adopts the definition of contributory negligence in connection with the ''assumption of risk'' which is referred to in *Schlemmer v. Buffalo, R. & P. Ry. Co.*, 220 U. S. 590, namely, that ''the conception underlying the servant's assumption of a known risk is essentially that of an implied agreement to accept the responsibility for any bodily hurt which may result from his exposure to that risk. The theory upon which contributory negligence is held to preclude him from recovery is that he is guilty of imprudence in the premises, and that his imprudence is entirely or partially the cause of the injury.'' 3 Labatt on Master and Servant, 2d Ed. sec. 1219. To the same effect is 8 Thompson on Negligence (White's Supp.) Sec. 4611. These definitions are directly applicable and pertinent to the facts shown by the evidence in this case. The Federal Employers' Liability Act, under which this suit was brought, provides that the fact that the employee may have been guilty of contributory negligence shall not be a bar to recovery, but the damages should be diminished by the jury in proportion to the amount of negligence attributable to such employee. Contributory negligence, therefore, although pleaded in defense, was not a defense to a recovery, but was a matter to be considered

190

by the jury merely for the reduction of damages. The instruction complained of correctly instructed the jury concerning the effect of contributory negligence; and the evidence in the record clearly establishes that the defense of assumption of risk was not involved in the case, except that this defense is set up in the special plea filed by appellant. The purpose of the instruction complained of was evidently to bring to the attention of the jury the provisions of the Federal Employers' Liability Act; and the legal effect of the matter of contributory negligence in the case.

We find no error in the instruction, nor in the court's modification or refusal of instructions for the appellant; and the record does not disclose any reversible error. The judgment is therefore affirmed.

*Judgment affirmed.*